IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
August 18, 2022 Session

**IN RE B. C.**

**Appeal from the Juvenile Court for Lake County**
**No. 17-000045-01    Andrew T. Cook, Judge**

_____

**No. W2021-00910-COA-R3-JV**

_____

This appeal involves a dispute between unwed parents, in which the mother filed a petition to modify a parenting plan and the father filed a counter-petition to modify the parenting plan and to modify custody.  The juvenile court dismissed both the petition and counter-petition finding that modification was not in the child's best interests.  The father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY W. ARMSTRONG, JJ., joined.

John M. Miles, Union City, Tennessee, for the appellant, Bradley S. C.

Andrea D. Sipes, Jackson, Tennessee, and Matthew A. Beaird, Dyersburg, Tennessee, for the appellee, Cekita L. S.

**OPINION**

### I.    FACTS & PROCEDURAL HISTORY

Cekita L. S. ("Mother") and Bradley S. C. ("Father") never married, but were in a relationship and lived together as a family from April 2014 until June 2020.  During their relationship, the parties had a child together, B. C. ("the Child"), who was born in 2016.[1] In 2017, while they still lived together, Father filed a "motion" seeking to establish himself as the father of the Child and to establish a parenting plan.  Mother later testified that Father

---

[1] We use initials and abbreviated names to protect the privacy of the Child in this case. Additionally, we note that both parties each had a child of their own before they had the Child together in 2016.  Father had a son who was born in 2012.  Mother had a daughter who was born in 2013.

wanted the parenting plan in case they ever separated and she tried to keep the Child away from him. She explained that Father filled it out and presented it to her, but she had problems with signing it. She said that she eventually signed it because they had a confrontation about it and he allegedly threatened her. The juvenile court entered an order in March 2017 declaring that the parties had entered into an agreed parenting plan in which Mother was designated as the primary residential parent. Additionally, the court noted that Father had voluntarily acknowledged paternity of the Child. The parenting plan's schedule provided that the Child would spend 183 days with Mother and 182 days with Father.

After the parties separated, Mother filed a petition to modify the existing parenting plan in July 2020. She sought to establish a new parenting plan "with reasonable parenting time." According to the proposed order attached to her petition, she wanted to reduce Father's visitation with the Child to every other weekend. Father then filed an answer and a counter-petition in August 2020. He agreed that the existing parenting plan should be modified and that a new parenting plan be established. Additionally, however, he sought to be established as the primary residential parent. He argued that Mother had "abused the process of the [c]ourts" and had "demonstrated a lack of stability and integrity" such that the court should establish him as the primary residential parent. He submitted a proposed parenting plan which provided that the Child would spend 280 days with Father and 85 days with Mother. In October 2020, Father filed a sworn petition for emergency custody requesting that the court award him custody of the Child. In this petition, he asserted the following: Mother had allowed her oldest child, who was seven years old at the time, to post a "revolting" video on TikTok in which she was "twerking" and "behaving in a manner that would only be appealing to a pedophile"; Mother had recently published a pornographic video of herself online where she engaged in "illicit and perverted sex acts," which Father described as "the most disgusting and debasive behavior"; and the Child had reported to Father that she had seen a naked man while she was in Mother's care.[2] After an ex parte hearing, the court entered an order for emergency custody placing custody of the Child with Father.

Mother then filed an answer to the petition for emergency custody requesting that the court rescind its order for emergency custody and reinstate custody to Mother. Her answer included the following: she admitted that a video of her oldest child was posted on TikTok, without her assistance, and that it was inappropriate; she explained that she disciplined her oldest child for posting the video on TikTok and that the video was taken at the maternal grandmother's home without her knowledge or assistance; she denied that she recently published a video online of herself engaging in pornographic sexual acts; she admitted that ten years ago she engaged in a pornographic video for which she was paid;[3]

---

[2] Father included a jump drive of the two videos referenced in his sworn petition as an exhibit to the petition.

[3] Mother averred that Father had knowledge of the video for several years and only used the video to "falsely and fraudulently" obtain emergency custody of the Child. According to Father, however, he was unaware of the video while they were together.

she denied that the Child had seen her with a naked man; and she stated that Father brought these charges against her only after he was rebuked and denied the ability to spend time with her. After a hearing, the court entered an order rescinding its previous order for emergency custody.

In April 2021, there was a confrontation between the parties when Father came to Mother's home in the night and demanded to see the Child. According to Mother, it happened on a night when her current boyfriend was at her home. She said that there was no confrontation between Father and her boyfriend. She explained that Father knocked on her door, she answered the door and spoke with him, and "that was it after that." However, he returned later that night banging on the window and screaming, "Where is [B. C.]? I want to make sure . . . she's okay." Mother told him the Child was in the bed asleep, but he kept demanding to be let in to see the Child. She eventually called the police, who then made Father leave, and she did not see him anymore that night. According to Father, he wanted to do a "welfare check" because Mother's boyfriend was staying overnight at her home. He explained that he just knocked on the door, Mother came to the door, and he told her he wanted to check on the Child. He left afterward, but he returned when he discovered that Mother had called the police. He then spoke with the police to let them know what was going on. He had hoped to get the police report to mention that Mother's boyfriend was there so there would be a record of an overnight guest. However, he stated that the boyfriend had already left by the time the police arrived.

In June 2021, the juvenile court held a hearing on modification of the parenting plan. Mother testified about the parties' relationship when they lived together, explaining that it had its good days and bad days. She also stated that there was a history of physical abuse between them which resulted in the police being called on occasion. She admitted to hitting Father once and "mark[ing] his eye . . . a little bit." Mother attributed the parties' separation in June 2020 to discord that arose between them after their home sold, which was apparently not owned by them. Therefore, they were unable to live there anymore and were forced to move. She explained that they could not come to an agreement about where they should move, which then escalated. After words were exchanged, she stated that she left the room to try to diffuse the situation and Father came behind her and pushed her down. She then managed to get away from him and called the maternal grandfather to come to the house to help her get some of her things. According to Mother, Father retrieved a gun from his truck when the maternal grandfather came over to the house and warned him to leave. She stated that she did not take anything from the house besides her clothes when she left that day. However, she was able to get the rest of her things sometime later. The parties also separated partly due to the fact that Father became upset with Mother when he found out she was seeing another man. This man had a number of felony convictions. She stated that she never lived with this man and denied that he was ever naked in the presence of the children.

Mother testified that she was the primary caregiver for the Child and carried out her

"motherly" duties, such as attending the Child's doctor visits and feeding, bathing, and nurturing the Child. She did the same for Father's oldest child who lived with them. She stated that Father was present in the Child's life, but he was mainly the breadwinner for the family when the they were together. She explained, however, that she had worked at several jobs both before and after the Child was born, such as a senior-adult caregiver, a postal worker, and a waitress. At the time of the hearing, she had recently started a new job where she was working a 12-hour night shift at a factory for four days each week. Due to her current job schedule, she depended a great deal on the maternal grandmother to help her with the Child. She testified that she was attempting to find another job where she could work during the daytime. In addition to being employed at the time of the hearing, Mother was paying $650 in rent for her apartment and had a written lease agreement in her name.

Mother admitted that she had worked as a stripper in the past and was paid to do a pornographic video. She testified that Father knew about the video before the Child was born. According to Mother, Father used the video against her whenever they had a disagreement. She stated that he told her that she "was a whore" and "didn't have morals." She believed that it was her job as a mother now to set a good example for her children, but admitted that she did not hold herself to that same standard when she was younger. She also testified that she was aware of the video of her oldest child dancing and did not approve of the child's behavior in the video. There was another video played during the hearing in which Mother was depicted in beach attire and was bent over dancing. Her current boyfriend filmed the video during their trip to Florida and posted it online. She said no one else was around, it was just a playful dance, and she was an adult who could dance and have fun sometimes. During that trip, she explained that Father had the Child. On a separate trip to Beale Street in Memphis, she admitted that she had the Child that weekend and left her to stay with the maternal grandmother while she was on the trip. She also admitted that she had attended a family member's birthday party at a club where someone was killed, and she was interviewed by the police as a result of the incident.

Mother testified about an exchange she had with one of her family members regarding Father. In that exchange, Mother stated:

> I wish you would beat that b***h boy ass. Man, I never knew how much of a b***h he is. I been trying to make s**t work out with him for so long, and I'm tired of MF trying to make me feel like I ain't nobody because his entire life he has already been around nobody[.]

There was another exchange she had with an acquaintance concerning Father. This acquaintance had a criminal record, and she admitted to giving him Father's address. However, she denied that the exchange was for the purpose of doing some sort of physical harm to Father. She also testified about her current boyfriend. She stated that he was a regular visitor at her home and would spend the night approximately one or two nights per

week when the children were there. He had a home of his own, but she never took her children there to spend the night. He also had children of his own, but he did not bring them to her home. She identified him in a photograph in which he was "[f]lipping the bird," but she explained that it was "young picture" of him. She was unaware if he had a criminal history, but she believed that she should check into that. She also admitted to unilaterally enrolling the Child in the Lake County School System although the existing parenting plan provided for joint decision-making.

Father testified that when the parties were together, he attended the Child's doctor visits and cleaned and cooked. Therefore, he said that Mother did not do those things exclusively. He agreed that Mother was involved in taking care of the Child and did not have any complaints about her parenting while they were together. Since June 2020, however, his opinion about her parenting had changed. He was concerned about her being with other men with criminal histories and engaging in risky conduct. He thought that the video of her dancing in Florida was inappropriate. He also disputed Mother's testimony and testified that he was unaware of the pornographic video while they were together. He denied that he ever hit Mother but stated that there were times he restrained her. He explained that, in most instances, the violence would be initiated by her, and he would then try to get her to stop.

When they separated, Father admitted that he retrieved his gun from his truck when the maternal grandfather came to move Mother out. However, he explained that he did not "flash" it, point it at anyone, or threaten to use it. Instead, he retrieved it as a precaution. He further explained that it was late, the children were asleep, and the maternal grandfather was yelling, screaming, and cussing. Father asked the maternal grandfather to leave because of his behavior, and he was also worried because of the instances where Mother had allegedly solicited others to do bodily harm to him. Afterward, Father stated that Mother was given the opportunity to get whatever she wanted out of their home and that they never had a disagreement about their belongings.

Father testified that he had been employed with the Tennessee Department of Corrections since 2013 and made "good money." He was currently a regional coordinator which involved overseeing clients in West Tennessee, but before that he counseled parolees and inmates. He explained that his job required him to travel occasionally to Memphis, but he was not required to do any overnight travel. He further explained that his job has made him protective of his children because it has made him aware that there are a lot of bad people in the world. As such, he was very cautious with his children and who he allowed them to interact with. He wanted to raise the Child in a healthy environment and hoped that both of his children would be productive, contributing members of society who would be able to maintain a healthy lifestyle. He tried to put nothing but good in his children. He also mentioned that he served as the parent representative for the Head Start program that the Child attended. Therefore, he said that others have trusted his judgment when it came to children.

Father testified that he loved the Child more than he loved himself. He explained that he "really didn't know love until [he] had a child." When it came to his children, he felt that he was selfless and put their interests above his own. He wanted to ensure that the Child had opportunities and wanted to be a supportive parent so the Child could reach whatever potential she chose to have. He explained that he was raised by his grandmother and did not really have his parents around, so he wished to be the parent that he always wanted to have. He had completed a parenting class, had provided health insurance for the Child, and had a whole life insurance policy that would be traded in for the Child's college education. He also stated that he tried to plan activities for his children and travel with them. He also attended church and took the child with him. Additionally, the Child had a room of her own where he was currently living, and he had bought a new home where the Child would continue to have a room of her own. He believed that his proposed parenting plan was in the child's best interests, which provided Mother with every other weekend each month, half of the holidays, and time during the summer. However, he was open to possibly providing Mother with extra time. He further testified that he was not opposed to joint decision-making.

During cross examination of Father, counsel for Mother brought up a video from a housewarming party that Father and the Child attended. It appears from the transcript that the video was shown in court via Mother's iPhone. The video apparently showed individuals from the party making signs or gestures with their fingers. After the video was shown, counsel for Father asked if it had been admitted yet, to which counsel for Mother responded, "I'm going to ask the Judge." Counsel for Mother then stated, "I want to introduce this as evidence of whatever it shows and for whatever it's worth." Counsel for Father stated, "I don't know how you're going to introduce it." Counsel for Mother then stated, "Well, [counsel for Father] is right. I can't even use it because I'd have to take her phone and do something with it." After a few more questions, counsel for Mother said, "Okay. The Judge can do whatever he wants to do with [the video]." As such, it appears from the transcript that the video was never offered into evidence. Father was also questioned about his current girlfriend. He explained that they did things together such as visiting the park and attending church and dinner together, but she never spent the night with him when he had his children. He was asked about a photograph of his girlfriend that was posted online in which she exposed her breasts, but he stated that he had not seen the photograph before. It does not appear from the transcript that counsel for Mother ever offered this photograph into evidence.

Several witnesses also testified on Father's behalf, including his mother, cousin, barber, co-worker, and the mother of his older child. Those witnesses all attested to Father's good character, positive parenting skills, and close relationship with the Child.

The court entered its order in July 2021. The court gave great weight to the testimony of the various witnesses who testified as to Father's "emotional fitness" toward

his Child. Yet, the court ultimately found that Father was not credible based on treatment of Mother, the confrontation that occurred in April 2021, and the entry and discussion regarding their parenting plan entered in March 2017. The court found a material change of circumstances because the parties were living together at the time of the entry of the parenting plan in 2017 but were now living separately. However, the court did not find that modification was in the Child's best interests. The court discussed the relevant factors and provided more than ten pages of discussion related to the Child's best interest. The court dismissed both Mother's petition for modification and Father's counter-petition for modification.

Additionally, the court expressed several concerns about both parties' behavior, noting that it was clear "neither party cares in any shape or form for another" and that the manner and demeanor in which both parties spoke against one another was "disheartening." The court continued as follows:

> In once again referencing the manner and demeanor of both parties, it is clear there is true, natural and utter disdain for one another, and their conduct towards the other (with [Mother] inquiring about persons to possibly "beat up" or assault [Father], and [Father's] actions of manipulation and manufacturing conflicts) is shameful in the eyes of this Court. These actions in the course of the five (5) hour long hearing in this cause do not give the Court much hope or faith in either party.

Therefore, the court ordered that both parties were to attend individual counseling and provide updates of their progress to the court. The court concluded, "It is clear to the Court that although their relationship is not fixable when it comes to their love for one another, something must be done to ensure that their parental relationship is repaired and only grows stronger." Thereafter, Father timely filed an appeal.

## II.    ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly restated:

1. Whether the court erred in considering a photograph of Father's girlfriend, which the court found could be "slightly provocative in nature," when the photograph was not offered into evidence;
2. Whether the court erred in considering a video, from which the court found that there appeared to be drinking and smoking of cigarettes, when the video was not offered into evidence;
3. Whether the court erred in weighing as evidence the circumstances surrounding the entry into the existing parenting plan or considering why the existing parenting plan was needed, where (a) the plan was sworn to and subscribed by both parties under

penalty of perjury; (b) both parties appeared in court and submitted the plan to a different judge for approval; and (c) the plan was then approved by that judge and no appeal was taken therefrom; and

4. Whether the court erred in failing to find that the preponderance of the evidence established that a modification of custody to establish Father as the primary residential parent was in the Child's best interests as the court's finding that it was not in the Child's best interests to modify custody to Father was an abuse of discretion because it reached an illogical result, resolved the issue of the Child's best interests based on a clearly erroneous assessment of the evidence, and/or relied on reasoning that caused an injustice.

For the following reasons, we affirm the decision of the juvenile court.

### III.   STANDARD OF REVIEW

The Tennessee Supreme Court has "emphasized the limited scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (stating that the appropriate standard of "review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise")). The Tennessee Supreme Court has explained that

> [a] trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings.

*Id.* (quoting *Armbrister*, 414 S.W.3d at 692 (citations omitted)). "Similarly, appellate courts will not interfere with a trial court's custody determination or decision concerning a parenting schedule absent an abuse of discretion." *In re Jonathan S.*, No. M2021-00370-COA-R3-JV, 2022 WL 3695066, at *5 (Tenn. Ct. App. Aug. 26, 2022); *see C.W.H.*, 538 S.W.3d at 495; *Armbrister*, 414 S.W.3d at 693; *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001); *Dungey v. Dungey*, No. M2020-00277-COA-R3-CV, 2020 WL 5666906, at *2 (Tenn. Ct. App. Sept. 23, 2020). "'An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *C.W.H.*, 538 S.W.3d at 495). Therefore, we will set aside a trial court's decision concerning custody or a parenting plan "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence." *Id.* (quoting *Dungey*, 2020 WL 5666906, at *2).

## IV. DISCUSSION

### A. Evidentiary Issues

#### i. Consideration of Evidence Outside the Record

We first address the two issues concerning the juvenile court's consideration of a photograph and a video not offered into evidence as exhibits. Interestingly, the question here is not whether such evidence was admissible or inadmissible; rather, it is whether the court improperly considered the evidence because it was never offered and admitted into evidence in the first place.

At the outset, we feel that it is important to review the procedure for the introduction of exhibits, which is summarized as follows:

> An attorney who wants to introduce an exhibit at trial should (a) ask the court reporter or other court officer to mark the exhibit for identification . . . ; (b) show the exhibit to adversary counsel (this should be reflected in the record), thereby giving him the opportunity to raise objections before foundation questions and answers suggest inadmissible matter; (c) either obtain the court's permission to approach the witness to deliver the exhibit for his inspection or, if required by court rule, ask that a court official present the exhibit to the witness; (d) lay the proper foundation for the admission of the exhibit, including proof of authenticity . . . ; and (e) then request that the exhibit be introduced into evidence.

*Edgemon v. Edgemon*, No. E2006-00358-COA-R3-CV, 2007 WL 1227467, at *4 (Tenn. Ct. App. Apr. 26, 2007) (quoting Lawrence A. Pivnick, *Tennessee Circuit Court Practice* § 24:12, at 703-04 (4th ed. 1995)).

The procedure used by the attorneys and the court regarding both the photograph and video is perplexing. From our review of the transcript, neither the photograph of Father's girlfriend nor the video of the housewarming party was ever offered or admitted into evidence. As previously discussed, counsel for Mother asked Father questions about the photograph of his girlfriend, but it does not appear from the transcript that counsel for Mother ever requested that the photograph be introduced into evidence as an exhibit. The transcript demonstrates that counsel for Mother also showed and asked Father questions about a video of a housewarming party that he and the Child attended. After attempting to offer the video into evidence, counsel for Mother conceded that he could not use it. He said, "I can't even use it because I'd have to take her phone and do something with it." After a few more questions, counsel for Mother then stated "[t]he Judge can do whatever he wants to with [the video]." Counsel for Father did not object to the questions about the

photograph or the video, but he did ask at one point whether the video had been admitted yet. He explained that he was waiting for counsel for Mother to offer the video in order to make an objection. At oral argument before this Court, counsel for Father stated that he was not given the opportunity to review the photograph or the video, nor did he request to see them. At the very least, counsel for Father should have raised an objection to avoid a potential waiver of this issue. *See* Tenn. R. Evid. 103(a)(1). Regardless, both the photograph of Father's girlfriend and the video of the housewarming party were never offered and admitted into evidence as exhibits, and they are therefore absent from the record.

It is apparent from the transcript, however, that at least the video was presented to and viewed by the judge because he stated, "Well, I would . . . like to see it. I haven't seen it. . . . [L]et me take a look there." Additionally, the court referenced both the photograph and the video in the "findings of fact" portion of its order. In regard to the photograph, the court stated that Father's "girlfriend currently . . . has a social media page on the social network Instagram which was alleged to display photographs of her in a manner that could be slightly provocative in nature[.]" In regard to the video, the court stated as follows:

> [Father] . . . on cross examination has . . . admitted to attending a party . . . in Illinois; upon a viewing of a video presented to [Father] and the Court, the Court must note that at this party, there was what appears to be drinking and some type of smoking of certain substances (the Court can only assume they were cigarettes, because the video did not provide audio or visual confirmation if the items were illegal in any form)[.]

We have "explained that a trial court may not rule upon evidence that is not properly introduced and admitted in the record." *State ex rel. Moody v. Roker*, No. W2019-01464-COA-R3-JV, 2021 872686, at *7 (Tenn. Ct. App. Mar. 9, 2021). Moreover, "[t]he fair and impartial administration of justice demands that facts be determined only upon evidence properly presented on the record." *Tarpley v. Hornyak*, 174 S.W.3d 736, 748 (Tenn. Ct. App. 2004) (quoting *Lillie v. United States*, 953 F.2d 1188 (10th Cir. 1992) (quoting *Price Bros. v. Philadelphia Gear Corp.*, 649 F.2d 416, 419 (6th Cir. 1981))).

An evidentiary error is "harmful and call[s] for reversal when 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *In re Estate of Smallman*, 398 S.W.3d 134, 152 (Tenn. 2013) (citing *State v. Gomez*, 367 S.W.3d 237, 249 (Tenn. 2012) (quoting Tenn. R. App. P. 36(b)))[4]; see also *Flax v. DaimlerChrystler Corp.*, 272

---

[4] Tennessee Rule of Appellate Procedure 36(b) provides in pertinent part that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

S.W.3d 521, 543 (Tenn. 2008). As such, "we will not reverse a trial court's judgment if an evidentiary error is harmless." *City of LaVergne v. Gure*, No. M2020-00148-COA-R3-CV, 2022 WL 3709387, at *4 (Tenn. Ct. App. Aug. 29, 2022); *see State v. Rodriguez*, 254 S.W.3d 361, 370 (Tenn. 2008). Upon further review of the court's order, we have found that the two references noted above were the only instances where the court mentioned the photograph of Father's girlfriend and the video of the housewarming party. The court did not reference or include any statements about the photograph or the video in its discussion of the best interests of the Child.[5] Therefore, to the extent that the court erred in considering the photograph and the video, we conclude that it was harmless.

### ii.    *Circumstances Surrounding the Entry of the Existing Parenting Plan*

We next address the issue of whether the court erred in considering the circumstances surrounding the entry into the existing parenting plan or considering why the existing parenting plan was needed.[6] We note that this issue involves an assessment of credibility made against Father. The court made a credibility finding against Father due to "two separate incidents." One incident was the confrontation that occurred between the parties in April 2021. The other was the circumstances surrounding the entry into the existing parenting plan in March 2017, which we discuss here.

The court commended Father for accepting responsibility and assuming his role as the Child's father by voluntarily acknowledging paternity. The court questioned, however, why there was a need to establish a parenting schedule when the parties were still living together at that point. The court continued as follows:

---

[5] Although the court did not reference the photograph of Father's girlfriend in its discussion of the best interests of the Child, it did refer to his girlfriend when discussing factor twelve of the best-interests factors. However, the court's reference led it to conclude that factor twelve slightly favored Father: "[Father] lives in a home he is renovating . . . and his girlfriend will come and stay often with them (though unlike [Mother's] boyfriend, she does not spend the night)."

[6] Additionally, Father argues that the juvenile court should not have considered the circumstances surrounding the entry into the existing parenting plan based on the doctrine of res judicata. However, we have previously answered the question why the doctrine of res judicata

> does not apply to bar evidence concerning events that took place before the previous order was entered when the trial court has already determined that a material change of circumstances has occurred and is tasked with determining how to modify a parenting plan consistent with the best interest of a child.

*Bowen v. Wiseman*, No. M2017-00411-COA-R3-CV, 2018 WL 6992401, at *9 (Tenn. Ct. App. June 29, 2018). We explained that "[t]he 'material change in circumstances' step satisfies the requirements of *res judicata*." *Id.* at *10. Res judicata does not bar a parent from putting on proof relevant to the best-interests analysis concerning the other parent's "history of bad behavior just because that behavior took place before the entry of the last parenting plan." *Id.* Here, the court's finding of a material change in circumstances is not at issue. Therefore, the court was permitted to consider all evidence relevant to the best-interests factors. *Id.* at *11; *see* Tenn. Code Ann. § 36-6-106(a)(1)-(15).

[Mother] stated that she reluctantly signed the parenting plan, and almost felt forced to do it by [Father]. This in the view of the Court establishes that [Father] by initiating this legal procedure of the parenting plan (a claim made by [Mother] that was never rebutted by [Father], which the Court therefore considers admitted as part of the record), was establishing for himself a legal insurance plan of sort, with a favorable result for him in the parties parenting schedule (every other week he would have custody of the child). The Court finds that [Father] entered this with the intent to have a "fail safe" plan, while the parties were still living together.

The picture painted by both parties is that in March of 2017, that the parties were living together harmonious with their children as a family. A happy family unit does not require a permanent parenting plan as a prerequisite to insure good parenting and successful cohabitation of a family unit.

Based on these circumstances described above and the confrontation that occurred in April 2021, the court believed that Father had demonstrated "a pattern of manipulative actions." While the court gave great weight to the testimony of various witnesses regarding Father's emotional fitness toward the Child, it did not give great weight to that testimony to counter any of its findings made regarding the credibility of Father.

This Court would not go so far as to characterize the circumstances surrounding the entry into the existing parenting plan as a part of a pattern of manipulative actions. As the court found, Mother did testify that she had problems with signing the parenting plan. Yet, the parenting plan provided each parent with nearly equal parenting time and designated Mother as the primary residential parent, even though the plan was filled out by Father. Both parties signed the parenting plan under the penalty-of-perjury clause and appeared before a judge who approved and signed the parenting plan.[7] Additionally, as a result of the parenting plan, the parties had a plan in place at the time they separated which allowed the Child to avoid instability, continue her relationship with each parent, and avoid potential conflicts regarding parenting time.

Nevertheless, we "afford trial courts considerable deference when reviewing issues that hinge on witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). This Court "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783

---

[7] Additionally, we note that the existing parenting plan, the execution of which the juvenile court found questionable, was signed and approved by Judge Danny Goodman. Further, the terms of that plan are those which the juvenile court here has found continue to be in the best interest of the Child.

- 12 -

(Tenn. 1999)); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). Mother testified that Father wanted a parenting plan in case they ever separated and she tried to keep the Child away from him. She further explained that she had problems with signing it, but she eventually signed it because they had a confrontation about it and he allegedly threatened her. Father never disputed these statements made by Mother. Relying on Mother's testimony, the court ultimately concluded that Father was not credible partly due to the circumstances surrounding the entry of the existing parenting plan. We reiterate that "[w]hen the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court." *Batey v. Deliver This, Inc.*, 568 S.W.3d 91, 95 (Tenn. 2019) (citing *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009)). In light of the considerable deference we afford the court in making this credibility determination, we conclude that it did not err.

## B. *Modification of Primary Residential Parent*

We now address the issue concerning the juvenile court's determination as to modification of custody to establish Father as the primary residential parent. "Decisions involving the custody of a child are among the most important decisions faced by the courts." *Grissom v. Grissom*, 586 S.W.3d 387, 391 (Tenn. Ct. App. 2019) (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)). "Once a permanent parenting plan has been established, 'the parties are required to comply with it unless and until it is modified as permitted by the law.'" *In re Jonathan S.*, 2022 WL 3695066, at *5 (quoting *Armbrister*, 414 S.W.3d at 697).

Tennessee Code Annotated section 36-6-101(a)(2)(B) and (C) governs a request for a modification of the primary residential parent designation or a modification of the residential parenting schedule. *Hartmann v. Hartmann*, No. M2018-00891-COA-R3-CV, 2019 WL 4187500, at *2 (Tenn. Ct. App. Sept. 4, 2019). "It is well settled that courts must apply a two-step analysis in addressing requests for modification of either the primary residential parent designation or the residential parenting schedule."[8] *In re Jonathan S.*, 2022 WL 3695066, at *5 (citing *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *4 (Tenn. Ct. App. Dec. 9, 2015)); *see Hartmann*, 2019 WL 4187500, at *2 ("This statute contemplates a two-step analysis, predicated upon a finding that there has been a material change of circumstance."). "[T]he court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a)." *Armbrister*, 414 S.W.3d at 697-98 (citations omitted). Therefore, a finding of a material change in circumstances is a "threshold question." *Id.* at 705.

---

[8] This Court has noted that there is "a different set of criteria for determining whether a material change of circumstance has occurred to justify a modification of a 'residential parenting schedule'" and modification of the primary residential parent designation. *Hartmann*, 2019 WL 4187500, at *2 n.2 (quoting *Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007)).

Here, the court found a material change in circumstances because the parties were living together at the time of the entry of the parenting plan in 2017 but were now living separately. On appeal, Father agrees with the court's finding of a material change in circumstances. Yet, he disagrees with the court's finding that it was not in the Child's best interests to modify custody to establish Father as the primary residential parent. Citing to *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011), he contends that that court's finding was not supported by a preponderance of the evidence, and it was therefore an abuse of discretion because it reached an illogical result, resolved the issue of the Child's best interests based on a clearly erroneous assessment of the evidence, and/or relied on reasoning that caused an injustice.

We state again that a trial court has broad discretion in custody matters, which "extends to the question of which parent should be named primary residential parent." *Grissom*, 586 S.W.3d at 391 (citations omitted). "Thus, 'the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection.'" *Id.* at 392 (quoting *Kathryne B.F. v. Michael David B.*, No. W2014-01863-COA-R3-CV, 2015 WL 4366311, at *8 (Tenn. Ct. App. July 16, 2015) (quoting *Maupin v. Maupin*, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013))). Choosing the primary residential parent involves a comparative fitness analysis, "requiring the court to determine which of the available parents would be comparatively more fit than the other." *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006) (citing *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. 1983)). When conducting this comparative fitness analysis, the court must consider the best-interests factors set out in Tennessee Code Annotated section 36-6-106(a). *Id.* (footnote omitted).

In assessing these factors, this Court has observed that "the welfare and best interests of the child are the paramount concern in custody, visitation, and residential placement determinations, and the goal of any such decision is to place the child in an environment that will best serve his or her needs." *Grissom*, 586 S.W.3d at 391 (quoting *Burden v. Burden*, 250 S.W.3d 899, 908 (Tenn. Ct. App. 2007) (citation omitted)). Likewise, "the needs of the child are paramount, and the desires of the parents are secondary." *Chaffin*, 211 S.W.3d at 286 (citing *Rice v. Rice*, M1998-00973-COA-R3-CV, 2001 WL 812258, at *2 (Tenn. Ct. App. July 19, 2001)). The factors are enumerated as the following:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;
> (2) Each parent's . . . past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best

interest of the child. In determining the willingness of each of the parents . . . to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent . . . to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent . . . denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . . ;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . . ;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. . . . ;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).[9] These factors are non-exclusive. *Grissom*, 586 S.W.3d at 393 (citing *Beyer v. Beyer*, 428 S.W.3d 59, 71 (Tenn. Ct. App. 2013)). Additionally,

---

[9] The Legislature amended this statute effective March 18, 2022, by adding a sixteenth factor. *See* 2022 Tenn. Laws Pub. Ch. 671 (H.B. 1866), eff. March 18, 2022. However, we consider the factors in effect at the time the petition was filed in July 2020. *See C.W.H.*, 538 S.W.3d at 497-98 (noting that statutes are presumed to operate prospectively and not retroactively, unless the statute is procedural in nature). Regardless, the sixteenth factor, "[w]hether a parent has failed to pay court-ordered child support for a period of three (3) years or more," would be inapplicable in this case. Tenn. Code. Ann. § 36-6-106(a)(16) (2022).

"determining a child's best interest is a fact-intensive inquiry." *Id.* (citing *Solima v. Solima*, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015)).

With the foregoing law in mind, we review the juvenile court's findings as to each factor. As previously stated, the court explicitly considered each and every factor and provided more than ten pages of discussion related to the Child's best interest. For factor one, the court found that it favored Mother. The court's findings as to factor one—the Child's relationship with each parent—were as follows:

> From 2014-2020, the parties resided together as a couple and during that time, [Father] was considered the breadwinner of the family, working mostly during the day while [Mother] took care of their child and the parties['] minor children with other respective partners from previous relationships. Both parties appear to have a very strong relationship with their child . . . and their love for the child is clear. [Mother] testified that she performed motherly duties for her child, [Father's] son, and the parties['] minor child on a daily basis, and continues to do so, regarding her child and the parties['] minor child, while balancing her work schedule. [Father] himself even stated that he had no complaints regarding "how [Mother] . . . took care of [the Child]" during the time they were together, and only until they separated, did his opinion of [Mother's] parenting change. Both parties['] work schedule is different, but the minor child's schooling and childcare is provided for by both parties. The Court finds that based on the record as a whole, this factor favors [Mother].

The testimony indicated that historically Mother was the primary caregiver for the Child when the parties were together. Although she performed much of the daily parenting responsibilities, Father also performed some parenting responsibilities. Additionally, we do not ignore the fact that Father was the primary breadwinner for this family when the parties were still together. His income allowed Mother to comfortably provide for the daily needs of the Child. Since their separation in June 2020, the parties have shared parenting time on a week-to-week basis in accordance with the existing parenting plan. Consequently, from June 2020 until the hearing in June 2021, both of them have equally shared in parenting responsibilities related to the daily needs of the Child. For these reasons, we find that this factor only slightly favors Mother.

The juvenile court found that factor two favored neither party. The court's findings as to factor two—each parent's past and potential for future performance of parenting responsibilities—were as follows:

> The Court was troubled in many instances during the hearing and the proof presented by both parties. [Mother] has on prior occasion spoke to friends

- 16 -

and other acquaintances about her frustrations with [Father] and her desire to see physical harm come about him. Furthermore, [Mother] enrolled the child in Lake County schools without consulting [Father] . . . . The Court does note however, that her responsibilities as a parent during her parenting time have not caused distress to the Court; the totality of the circumstances establish that [Mother] has acted in a caring and loving manner toward the parties['] child . . . and that since the parties['] separation that the child has not missed any visitation with either parent. This factor also in the Court's view does not favor [Father]; [Father's] actions regarding the Court's finding of his lack of credibility further do not give the Court great assurance of his willingness and potential for future performances of parenting responsibilities and also to facilitate and encourage a close parent[-]child relationship between the parties and the minor child. For this reason, the Court cannot find neither [sic] party to be favored in regards to this factor.

In an exchange with a family member, Mother expressed a desire to see physical harm come to Father and admitted to giving Father's address to an acquaintance who had a criminal record. However, she denied any intent of physical harm toward Father. Additionally, Mother admitted to unilaterally enrolling the Child in the Lake County School System, although the existing parenting plan provided for joint decision-making. Father wanted to enroll the Child in school in Dyer County, and Mother agreed at the time of the hearing that the Child should be moved to the Dyer County School System. Father testified that if the court approved his proposed parenting plan, he was willing to work with Mother to provide her with unscheduled time if she had an opening and it worked for him. He was not opposed to joint decision-making, but he was concerned that Mother would "fly off the hinges." As the court stated in its findings, there was no history of any denial of parenting time by either parent.

Despite the foregoing, the court found this factor favored neither party due to its credibility finding against Father. If not for the credibility finding against Father, we would find that this factor favors Father. As previously discussed, however, we "afford trial courts considerable deference when reviewing issues that hinge on witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly*, 445 S.W.3d at 692 (quoting *Binette*, 33 S.W.3d at 217). This Court "will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Id.* (quoting *Wells*, 9 S.W.3d at 783); *see also Hughes*, 340 S.W.3d at 360. As such, in light of the court's credibility finding against Father, we find that this factor favors neither party.

The juvenile court found that favor three—a parent's refusal to attend court ordered parent education—favored Father because he had completed a parenting class and Mother had not. Although both parties were ordered to complete the parenting class in 2017, Father ultimately completed the parenting class in May 2021 and provided a certificate of

completion. There was no evidence that Mother had enrolled in or completed a parenting class. Therefore, we agree that this factor favors Father.

The juvenile court found that factor four—the disposition of each parent to provide for the Child—favored both parties equally. The court found that both parties were able to provide the Child with a home, food, clothing, an education, and the needs and the care required for the Child to live a healthy and happy lifestyle. Both parties were employed and had a home for the Child. Father provided health insurance for the Child and had a whole life insurance policy that he said would be traded in for the Child's college education. Additionally, Mother had the Child on TennCare. This Court has no concern about either parties' ability to provide the necessary care for the Child. We agree that this factor favors both parties equally.

The juvenile court found that factor five—the degree to which a parent has been the primary caregiver—favored Mother. For the same reasons applied in factor one, we find that this factor only slightly favors Mother.

The juvenile court found that favor six—the love, affection, and emotional ties between each parent and the Child—favored both parties. The court stated that both parties loved the Child and were exceptional parents. The court noted that two witnesses unrelated to Father testified that he had an outstanding bond with the Child. Father's barber and his co-worker both had good things to say about the Child's bond with Father. The mother of Father's oldest child also testified that Father was an outstanding father who went above and beyond for his children. Furthermore, the paternal grandmother and Father's cousin testified that Father was a great father. In addition to these witnesses, Father testified about his love for both of his children and how he put their interests above his own. There was considerable testimony regarding Father's love for the Child; however, there is nothing in the record that would cause this Court to question Mother's love, affection, and emotional ties to the Child. Both parties clearly love the Child and have been continuously present in her life. Therefore, we agree that this factor favors both parties.

The juvenile court found that factor seven—the emotional needs and developmental level of the Child—favored both parties equally. The court stated that especially due to the Child's young age, she was in absolute need of love and support from her parents. The court further stated as follows:

> The parties wish to amend the previous parenting plan to reflect one party receiving a reduced role in the child's life through visitation. The parties lived continuously together as a family for the first 3 ½ years of this child's life and since then living bi-weekly with each parent, respectively. The Court in considering this child's best interest finds that because of the child's familiarity in having a continuous and frequent relationship with both parents . . . it is in her best interests concerning her emotional needs and her

developmental level that she continue[s] to have the same relationship with both parents that she currently is benefiting from; therefore, this factor favors [Mother] and [Father] equally.

In addition to the court's statements above, we note that the Child does not have any special needs. Like the juvenile court, we find that the continuous and frequent relationship with both parties is paramount in considering this factor. Any disruption of the Child's present schedule with either parent is not in her best interests. As such, we agree that this factor favors both parties equally.

The juvenile court found that factor eight—the fitness of each parent—favored neither party in regard to moral fitness but favored both parties in regard to emotional and mental fitness. The court reasoned as follows:

Both parties have given the Court concern when it comes to this factor. Morally, the Court cannot condone in any shape or form [Mother's] actions depicted on video in a pornographic manner. Her fitness in that regard is absolutely questionable but is somewhat cloudy given that the video was alleged to have been performed long ago, when she lived in Atlanta, Georgia, prior to meeting [Father] or giving birth to the minor child; furthermore, she and [Father] have attended church together with the minor child as family, something the Court does find in her favor for moral fitness. Her mental and emotional fitness seems to be appropriate given that she has assumed mostly the role of primary care giver for the majority of the minor child's life and furthermore that she has even taken care of her child from a previous relationship and [Father's] other child and that up until the separation of the parties, did [Father] find that her parenting had become questionable. Her physical fitness is without dispute and is not considered by the Court. [Father] appears to have great emotional fitness and moral fitness to parent the child, by the testimony of the witnesses which describe him as a loving and caring father, always putting his kids first and furthermore by his attendance in church . . . . But just like [Mother], his moral fitness also can be questionable; this Court has previously mentioned that his credibility regarding prior incidents revolving around his treatment of [Mother] regarding the Parenting plan implementation and the actions and comments at [her] home in April of 2021, cause the Court to pause in considering his behavior when weighing moral fitness. It is not moral to manipulate and manufacture certain outcomes which the Court has found that [Father] has done in the past, regarding the parenting plan and residential schedule of this child. For this reason, neither party is favored regarding moral fitness but both are favored when it comes to the emotional and mental fitness in their ability to parent the minor child.

- 19 -

At the outset, we note that both parties testified that they have each attended church regularly. We agree with the juvenile court that we cannot condone Mother's actions in the past which were depicted in the pornographic video. However, we note the video was made more than a decade ago according to Mother, and it appears she has put that sort of lifestyle behind her. She was an adult when the video was made, but she was not a mother at the time and explained that she now holds herself to a different standard compared to when she was younger. As for Father, we have previously discussed that we would not go so far as to characterize the circumstances surrounding the entry into the existing parenting plan as manipulative or manufactured. Additionally, we have recognized the benefits to the Child from having a plan in place at the time the parties separated. As for Father's actions in April 2021, his concern was understandable; however, going to her home at such a late hour was not an ideal time to address his concern. Ultimately, we agree that there is some concern in regard to the parties' moral fitness. Yet, like the juvenile court, we agree that both parties are emotionally and mentally fit to parent the Child. This factor favors both parties.

The juvenile court found that factor nine—the Child's interactions and interrelationships with other family members and her involvement with her surroundings, school, and activities—favored both parties equally. The court's findings were as follows:

> The child has lived with her half-brother and sister in the time that is continuous through the child's birth up until the present, in which the child lives with each parent bi-weekly. The testimony from all witnesses and the parties indicates no evidence of a strained or negative relationship with any sibling or relative. Furthermore, the parties have support from both sides of their family, with [Mother's] mother even showing and providing great assistance to [Mother] in assisting her in picking up the child from school and babysitting the child while [Mother] is at work. Furthermore, the parties are in agreement that they wish for the minor child to attend school in Dyersburg, TN. The Court finds this factor favors [Mother] and [Father] equally, as it would appear regarding [Mother], that her mother has a large role in the child's life and can continue to assist her with the child when needed.

From our review of the record, there is no indication of any negative interactions or interrelationships with a sibling or other relative. The Child lived with her half-brother and half-sister for the first three-and-a-half years of her life. After the parties separated, the Child continued to interact with her half-siblings. Father stated that the Child got along well with her brother. Furthermore, the maternal grandmother spent a lot of time with the Child due to Mother's current work schedule. We therefore agree that this factor favors both parties.

The juvenile court found that factor ten—the importance of continuity—favored

both parties equally. The court applied the same reasoning that it did for factor seven. It explained its reasoning as follows:

> Continuity has been a pattern for this child the majority of her young life; the Court believes that a substantial disruption that has been requested by both parties in modifying the parenting plan for this child is not in her best interest and that furthermore, the continuity which she has been privy to in the past and in the present time, should continue. Therefore, the Court finds this factor favors each party equally.

Likewise, we agree that the Child's continuity is of utmost importance here. The Child lived in a stable and satisfactory environment for the first three-and-one-half years of her life when the parties were together. Although she now splits time between the parties, she continues to live in such an environment in each of their respective homes. We agree that this factor favors both parties equally.

The juvenile court did not apply factor eleven—evidence of abuse—based on the circumstances of the case. The court explained that

> [t]here was no testimony provided by either party or witnesses to establish any proof of physical or emotional abuse to the minor child. [Mother] alleges that [Father] physically assaulted her in the past, but [Father] denies this. There was no proof from a third party or any exhibits or other forms of evidence to support her allegations of physical abuse. The Court does pause to consider the manipulative and manufactured acts by [Father] regarding [Mother's] past incidents in the pornographic video, and the Court did not find his statements credible as to his denial of knowledge [of] the video's existence. Because however, the lack of physical evidence other than [Mother's] own testimony regarding the video being used against her for moral purposes, the Court is hesitant to apply this factor in favor of either party and therefore does not.

As the court noted, there was no proof establishing any physical or emotional abuse to the Child. However, Mother claimed that there was a history of physical abuse between her and Father, and she admitted to hitting him once. Father denied that he ever hit Mother but stated that there were times he restrained her. He admitted that tires had been cut, doors had been knocked in, and holes had been knocked in the wall, but maintained that he never struck her. There were also instances where Mother had either expressed a desire to see physical harm come to Father or allegedly solicited an acquaintance to do physical harm to him. Whether or not she actually desired to see physical harm come to Father, Father testified that he was apprehensive on one occasion due to these actions by Mother. Additionally, there was a confrontation in April 2021 between the parties when Father came to Mother's home in the middle of the night and demanded to see the Child. While

the parties' stories differ in regard to the physical abuse and the confrontation in April 2021, we conclude that this factor favors neither party.

The juvenile court found that factor twelve—persons who reside in or frequent the home of a parent—only slightly favored Father. The court's findings were as follows:

> The Court must note here that [Mother] has prior had a relationship with a felon, who never stayed overnight during [her] parenting time and was never established to have had many if any interactions with the Child. At the present time, it appears [Mother] has a home that is free of any criminal activity and is an appropriate dwelling; [Mother's] boyfriend does frequent her home, but he was never established to have engaged in any criminal activity or been convicted of any crimes himself and appears to be a working father of two children. Should this statute say "Person who has frequented in recent time", then this factor would overwhelmingly favor [Father]. [Father] lives in a home he is renovating . . . and his girlfriend will come and stay often with them (though unlike [Mother's] boyfriend, she does not spend the night). Because of [Mother's] past relationship in which a felon has frequented her home, this factor slightly favors [Father].

Around the time the parties separated, Mother was seeing another man who had a number of felony convictions. In Father's sworn petition for emergency custody in October 2020, he stated the Child had reported to him that she saw this man naked while she was in Mother's care. However, Mother denied that the man was ever naked in the presence of her children. At the time of the hearing, she had a boyfriend who was a regular visitor at her home and would spend the night about one or two nights a week when her children were there. There was no evidence to establish that he had a criminal history or had engaged in any criminal activity. Father also had a girlfriend at the time of the hearing, but he stated that she never spent the night with him when he had the children. Therefore, we agree that this factor slightly favors Father.

The juvenile court found that factor thirteen—the preference of the Child—did not apply because the Child was only four years old. Given the age of the Child, we agree. The juvenile court found that factor fourteen—each parent's employment schedule—favored both parties equally. The court stated as follows:

> The parties work schedule is made complicated somewhat by [Mother's] frequent job changes. [Father] has been employed by the same employer, in the same capacity for the past six (6) years. Testimony by [Father] indicated that due to the ongoing COVID-19 pandemic he has been allowed to work from home, and also that he would have to travel occasionally to Memphis, but the rest of his office hours would differentiate between Dyersburg and Union City . . . . [Mother's] schedule of 3rd shift is somewhat convoluting

- 22 -

but it appears that she has great assistance from her mother to take care of the child when she has to leave for work at 6 p.m. each night . . . . For this reason, it appears that her work schedule also allows her to take the minor child to school in the mornings and when she is able to, have her . . . or her mother pick the child up from school. Because of the continuity of [Father's] schedule and also the assistance [Mother] receives from her mother, both parties are equal when it comes to this factor regarding the child's best interest.

Father has had a stable job with the Tennessee Department of Corrections since 2013. Additionally, his work situation was flexible and allowed him to work from home. Conversely, Mother had worked multiple jobs in the past. At the time of the hearing, she was working a 12-hour night shift at a factory for four days a week. Thus, compared to Mother's work schedule, Father's work schedule was much more flexible. *See Brunetz v. Brunetz*, 573 S.W. 3d 173, 182 (Tenn. Ct. App. 2018) (comparing the flexibility of each parents' work schedule). Due to her work schedule, Mother depended on the maternal grandmother for assistance, and she and her children were required to stay with the maternal grandmother for four nights each week. Mother testified that she was making efforts to find a new job with better hours. Therefore, she recognized that her current schedule was not ideal and admitted to depending a great deal on the maternal grandmother under the circumstances. As such, we find that this factor favors Father.

In addition to these factors, the juvenile court considered for factor fifteen—any other factors deemed relevant by the court—the circumstances surrounding the signing of the existing parenting plan, the confrontation that occurred in April 2021, and the claims that Father made concerning the pornographic video. The court stated as follows:

> The Court has already stated . . . it does not find [Father's] intentions credible regarding the proposition to [Mother] regarding the Parenting Plan, the actions and comments he made regarding what he claimed "making sure his child was ok" . . . in April of this year, and finally his claims he did not know prior to the relationship ending with [Mother], the existence of her performance in a pornographic video, or that he never used videotape against her for moral reasons during arguments and any other general argument. The Court finds that because it appears [Father] has multiple times manipulated or manufactured a situation, it is not in the best interest of the child to make him the primary residential parent and change custody. The Court views the incident of April 2021, as a clear attempt to interfere in the parenting time of [Mother]. For this reason, the Court considers these incidents as factors in determining the best interest of the minor child.

In light of the trial court's credibility finding against Father as explained *supra*, we find that this factor favors Mother.

- 23 -

Based on its review of the factors, the juvenile court ultimately concluded that modification was not in the best interests of the Child. While we have reached a slightly different result in regard to some of the factors above, we cannot determine that the evidence preponderates against the juvenile court's ultimate findings. Further, because this is a custody matter, we reiterate that the ultimate question here is whether the court abused its discretion, *Grissom*, 586 S.W.3d at 392, and that "an appellate court should not 'tweak' absent an abuse of discretion," *Armbrister*, 414 S.W.3d at 706 (citing *Eldridge*, 42 S.W.3d at 88). "The abuse of discretion standard does not require a trial court to render an ideal order . . . to withstand reversal." *Bowen*, 2018 WL 6992401, at *11 (quoting *Eldridge*, 42 S.W.3d at 88). Therefore, we also conclude that the court's ruling did not fall "outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence." *In re Jonathan S.*, 2022 WL 3695066, at *5 (quoting *Dungey*, 2020 WL 5666906, at *2).

## V.    CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Bradley S. C., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE